**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**MARK F. BEDFORD,**

       **Petitioner,**

**vs.**                        **Case No. 4:03cv291-RH/WCS**

**JAMES V. CROSBY,**

       **Respondent.**

_____/


**REPORT AND RECOMMENDATION**

This is a *pro se* amended petition for writ of habeas corpus filed by Mark F.

Bedford pursuant to 28 U.S.C. § 2254.  Doc. 8.  Petitioner challenges his conviction for

armed robbery with a weapon, aggravated assault with a deadly weapon, and resisting

an officer with violence in the Circuit Court of the Second Judicial Circuit, in and for

Leon County, Florida, case number 96-1373.  After the pro se amended petition was

filed, an attorney entered an appearance for Petitioner.  Doc. 14.

Respondent filed a motion to dismiss arguing that the petition was untimely.

Docs. 15 and 16 (amended).  Petitioner did not file a response.  The motion was denied.

Docs. 19 (report and recommendation) and 20 (order adopting).  Respondent filed an answer, doc. 23, and the state record, doc. 24.  Petitioner has not filed a traverse.

**Procedural History**

Petitioner was represented by Daryl Parks at trial.  He was represented by Benjamin Crump at sentencing.  Parks and Crump have a law practice together.

Petitioner was convicted at a second jury trial of armed robbery with a weapon, aggravated assault with a deadly weapon, and resisting an officer with violence.  The first trial ended in a mistrial because the jury could not agree upon a verdict.

Petitioner was sentenced on December 4, 1996, to life in prison on the first count.  He took a direct appeal.  The convictions were affirmed, but the case was remanded for resentencing.  Petitioner was resentenced as an habitual offender to a term of 20 years followed by probation for life.

Petitioner filed a Rule 3.850 post-conviction motion, and appealed the denial of that motion, but raised only two claims in that appeal.  Petitioner brings five claims to this court.

**Section 2254 Standard of Review**

For claims which were properly exhausted and adjudicated in state court, this court's review is limited.  "[A] determination of a factual issue made by a State court shall be presumed to be correct," and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Bui v. Haley, 321 F.3d 1304, 1322 (11th Cir. 2003) (citing the statute, footnote omitted).  Moreover, as to a factual issue adjudicated by the state court, Petitioner must show that the adjudication "resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2); 321 F.3d at 1322 (citing the statute).  Section 2254(d)(2) is satisfied "only if it is shown by clear and convincing evidence that the state court's presumptively correct factual findings do not enjoy support in the record."  Lomholt v. Iowa, 327 F.3d 748 , 752 (8th Cir. 2003) (citing § 2254(e)(1), other citation omitted).

As to legal findings, a petitioner is entitled to federal habeas relief only if the state court's adjudication of the merits of the federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meanings.  Williams v. Taylor, 529 U.S. 362, 404-406, 120 S.Ct. 1495, 1519-1520, 146  L.Ed.2d 389 (2000) [1]; Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002) (citing Williams).   "[C]learly established Federal law, as determined by the Supreme Court of the United States," refers only to holdings of the Supreme Court, but decisions of lower federal courts may be considered to the extent that they demonstrate how those courts applied Supreme Court  precedent.  Hawkins v. Alabama, 318 F.3d 1302, 1309 (11th Cir. 2003) (citations omitted).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

---

[1] This was Justice O'Connor's opinion for the Court in Part II; the rest of the opinion for the Court (Parts I, III, and IV) was by Justice Stevens.

529 U.S. at 412-413, 120 S.Ct. at 1523; 535 U.S. at 694, 122 S.Ct. at 1850.

The law governing ineffective assistance of counsel claims was clearly established in Strickland v. Washington, 466 U.S. 668, 690, 694, 104 S.Ct. 2052, 2066, 2068, 80 L.Ed.2d 674 (1984).  Williams, 529 U.S. at 405-406, 120 S.Ct. at 1519-1520; Bell, 535 U.S. at 694-695, 122 S.Ct. at 1850.  Under the two part test of Strickland, Petitioner must demonstrate both deficient performance and prejudice to the outcome.

To establish deficient performance, a petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  In reviewing the claim, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  Petitioner has a heavy burden to establish the deficient performance prong of Strickland, by showing that "no competent counsel would have taken the action that his counsel did take."  Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citation omitted).  There are no rigid requirements, or absolute duty to investigate a particular line of defense.  Id.

> Indeed, "[c]onsidering the realities of the courtroom, more is not always better.  Stacking defenses can hurt a case.  Good advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others."

261 F.3d at 121 (citations omitted).

For prejudice, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694, 104 S.Ct. at 2068.

Although Strickland explained the performance and prejudice prongs of analysis, "there is no reason . . . to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S.Ct. at 2069.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  *Id.*

If the state court identifies and applies the framework of Strickland in assessing an ineffective assistance claim, its adjudication does not satisfy the "contrary to" language of § 2254(d)(1) even if this court might have applied Strickland differently. Williams, 529 U.S. at 406, 120 S.Ct. at 1520; Bell, 535 U.S. at 698, 122 S.Ct. at 1852. To determine whether the state court's adjudication was an "unreasonable application" of Strickland, Petitioner "must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance . . . .  Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner."  Bell, 535 U.S. at 698-699, 122 S.Ct. at 1852 (*citing* Williams).  "[T]he most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  Williams v. Taylor, 529 U.S. at 410, 120 S.Ct. at 1522.

**Ground One**

Petitioner contends that his trial attorney was ineffective for failing to call an alibi witness at trial, Melissa White.[2]  Respondent agrees that state court remedies have been exhausted as to this claim.

### Petitioner's allegations

The robbery of the victim in the parking lot of a Winn Dixie grocery store occurred at 6:45 p.m. on April 23, 1996.  Petitioner asserts that at the first trial, Melissa White testified that she and Petitioner and were playing basketball at a park from about 4:00 p.m. to a little before 7:00 p.m. that day.  Petitioner alleges that White testified that she then dropped Petitioner off at the King Food Store, which he contends is 1.5 miles from the Winn Dixie where the crimes took place.  The first trial ended in a mistrial when the jury could not agree on a verdict.

Petitioner further alleges that at the second trial on November 1, 1996, Melissa White was not called as a witness.  There were other alibi witnesses, however. Emanuel Godfrey testified that he went to the park at the request of Petitioner, arriving a little before 7:00 p.m., and saw Petitioner on the basketball court.  He had seen Petitioner and a young woman leave Petitioner's home earlier that evening in a car, and he saw that car at the park.  Lamika Ward testified that she arrived at the park at about 6:40 p.m. and saw Petitioner and a young woman on the basketball court.

Petitioner contends that White was an essential witness because she alone could account for his whereabouts from about 4:00 p.m. to after 7:00 p.m. that day.  He

---

[2] Petitioner spells the name Melisha, but the court uses the spelling Melissa as used throughout the record.

argues that this evidence would have shown that the victim and her young daughter misidentified Petitioner as the person who robbed them.  Petitioner also contends that it was attorney error to assume that White would have been impeached by her prior convictions.  Petitioner states that those convictions were not proper impeachment because adjudication of guilt had been withheld.

In ruling on Petitioner's Rule 3.850 motion, the circuit court found:

> Mr. Parks [Petitioner's trial attorney, Daryl Parks] testified that he made the decision not to call Ms. White because the alleged victims came across as excellent witnesses, Ms. White was not a credible witness, and his strategy was to not call a witness with a criminal background in an attempt to make the defense look better.  Mr. Parks thought that defense witness Emanuel Godfrey was a good witness and that Ms. White would have been "extra weight that we did not want to carry in a trial."

Doc. 24, Ex. H, p. 2.  The court found that the decision not to call White as a witness was a tactical and strategic decision (not attorney error) and not ineffective assistance of counsel.  *Id.*  The court also reasoned that prejudice to the outcome had not been shown.  *Id.*

## Evidence in the record

At the Rule 3.850 hearing, Daryl Parks testified that after the first trial ended in a mistrial, he felt that "we had to do something different."  Doc. 24, Ex. K, p. 31.[3]  He reasoned that

> the more credible our side appeared, the better it was.  It was a situation in the trial where the folks that were the alleged victims were this white family who appeared – made great witnesses in trial, two little kids, and they just came across as the golden kids.

---

[3] The transcript of the hearing also has the record on appeal page numbers, but the transcript pages will be used here.

> And so I had to find some kind of way to make us look a little bit better. And the theory that I came up with was maybe if I didn't have that witness [White] who has this criminal background to bring her in.  And I thought that Emmanuel[4] made a pretty decent witness, and we would go from there.  And that, you know, I thought that [White] represented some extra weight that we did not want to carry in a trial.  So it was just really a judgment call.

*Id.*

On cross examination, Parks said that although White gave Petitioner an alibi from 4:00 p.m. to after 7:00 p.m., he had to weigh her credibility "in terms of how she talks about and how she described it," and decided after hearing her at the first trial that in her "demeanor" "she did not come across as believable."  *Id.*, pp. 44-45.  He said that it "changes the whole thing and the juries reject testimony" when one witness appears not to be credible.  *Id.*, p. 44.  He explained:

> In terms of how she appeared to the jury, how she came across to the jury.  The best witnesses when they testify, folks have to believe they believe the person is telling the truth. . . .

> I don't think she was that person.  I think Emmanuel Godfrey, right, I think came across as a far better witness.  And, yes, the argument can be made that two people makes better than one, right, but if you do something that brings a cloud over your camp then you lose then too.

*Id.*, p. 45.  Parks said he did not think that the jury hung in the first trial because of White's testimony, but he admitted that this was "pure speculation" as he really did not know why the jury was unable to reach a verdict.  *Id.*, p. 47.

The trial record from the first trial is not before this court.  However, the testimony of White from the first trial was summarized by the State answer brief on appeal from denial of Petitioner's Rule 3.850 motion:

---

[4] The name is spelled both Emmanuel and Emanuel in this record.

> The witness testified that she was a friend who drove from Quincy to play basketball with appellant.  After they were finished they went to King store on Orange avenue.  She testified that it was around seven pm.  She testified that she was not able to say that it was at seven only around seven pm.  (T 8/27 145)  Ms White testified that she dropped appellant off.  (T 8/27 150)  The witness testified that the police officer pulled in behind her as she pulled out  (T 8.27 150)  She testified that she did not observe the police officer exit his vehicle.  (T 8/27 151)  However, she observed appellant running away.  (T 8/27 154)  Further the witness testified that she had been convicted on two occasions of crimes involving dishonesty and had continued to visit the defendant at the jail after his arrest.  (T 8/27 142, 153)

Doc. 24, Ex. I, Answer Brief, pp. 3-4 (errors in punctuation and capitalization, in original).

White testified at the Rule 3.850 evidentiary hearing.  She had reviewed her testimony from the first trial.  Doc. 24, Ex. K, p. 72.  She said she testified that on that day she went to Petitioner's house between 3:00 or 3:30 p.m.  *Id.*, p. 73.  She testified that they left to go play basketball.  *Id.*  She said that at about 7:00 p.m., she "put him off at a convenience store, and I left and went home."  *Id.*  She said they were just friends, that she was not his girl friend.  *Id.*  White said she was living in Quincy, and was not employed at the time of the offense.  *Id.*, p. 74.  At the first trial White said she was asked if she had been convicted of a crime involving a false statement or dishonesty on two occasions.  *Id.*, p. 75.  She said (at the 3.850 hearing) that she was not convicted of those crimes, that adjudication of guilt was withheld.  *Id.*  One of the offenses was forgery.  *Id.*

At the second trial, the adult victim, Janice Davis, testified that the offense occurred at about 6:45 p.m.  Doc. 24, Ex. A, pp. 64-65 of the trial transcript.  She testified that she was in the parking lot at a Winn Dixie Store loading groceries when

Petitioner appeared.  *Id.*, p. 66.  Petitioner had a gun, she said, and threatened to shoot her son if she did not give him her money.  *Id.*, p. 68.  Davis said:

> A.     The man is standing there at my elbow.  I didn't panic at first because I've had people come up to me in parking lots before.  But his first words were, "Don't make a scene."  He said, "Look what I have here."  It wasn't that many words.  "See what I have?  Your son will have a hole in him if you don't give me all your money.  I want all your money."
>
> Q.     Okay.  Did you do what he wanted you to do?
>
> A.     Yeah.  He had a gun on my son.
>
> Q.     . . . [H]ow did you feel . . . ?
>
> A.     Petrified.  I'm shaking like I am now.  I mean every time I relive this thing, I get the shakes, you know.

*Id.*, pp. 68-69.

Davis said that she gave him what she had, but Petitioner did not immediately leave the area and she continued to load her kids (the son and a nine year old daughter) into the car.  *Id.*, pp. 71-72.  Thus, the victim had a long time to see the person who robbed her.  She testified that she was very certain that Petitioner was that person.  *Id.*, p. 73.

Davis remembered the clothing that Petitioner wore that evening and identified the clothing which had been taken from Petitioner after his arrest as the same clothing.  *Id.*, pp. 75-76.  *Id.*, p. 76.  The T-shirt was black with a distinctive face covering the entire front.  *Id.*  The shorts were white and knee length.  *Id.*  She was able to state the assailant's height, since the assailant was about as tall as Davis (five feet six inches).  *Id.*  She remembered that the assailant had two stud earrings in his left ear.  *Id.*  Her daughter remembered that he had a beard and mustache.  *Id.*, p. 77.  Davis also

identified Petitioner as her assailant at a police substation just a short time after the

offenses had been committed and he had been arrested.  *Id.*, p. 82.

Davis's daughter, Becky Davis, was present during the commission of the

offenses.  *Id.*, p. 96.  She remembered that the man had "a black tee shirt on with a face

on it, and white jean shorts, and a beard and a moustache, and a hat," a "black hat."

*Id.*, p. 97.  She identified a photo of Petitioner as the "man that robbed us."  *Id.*, p. 98.

After he got the money from her mother, she said that the man "stayed there and

talked."  *Id.*, p. 99.  She also remembered that when she was with the police, they

showed a man to her and she told the police that this man was the person who robbed

them.  *Id.*, p. 102.  She identified the shorts and T-shirt taken from Petitioner as the

ones worn by the robber.  *Id.*, p. 103.

Officer James Fairfield responded to the call that a robbery had just occurred.

*Id.*, p. 123.  He was in the 400 block of Paul Russell Road when the call came in.  *Id.*, p.

122.  He had been given the description of the suspect provided to the police by Davis.

He drove north on Meridian Road from Paul Russell Road, and at the intersection of

Meridian Road and Orange Avenue, he saw a suspect in an open yard just east of the

King Food Store; the suspect fit the description given of the robber, wearing a black ball

cap, black T-shirt with a face, and white knee length shorts.  *Id.*, p. 123.  That person

was Petitioner.  *Id.*  Officer Fairfield said that he did not see Petitioner get out of a

vehicle, but saw him just walking down the street.  *Id.*, p. 125.  Officer Fairfield pulled off

into the far parking lot.  *Id.*  Petitioner walked to the front of the store.  *Id.*  Petitioner

began to talk to some friends in front of the store beside a car.  *Id.*, pp. 125-126.

Fairfield was afraid that Petitioner would get into the car; Fairfield said to Petitioner,

"Excuse me sir, can I talk to you?" so that he could distract him from getting into the car. *Id.*, p. 126.  Fairfield decided to try to stall until backup arrived, so he asked if he could talk to Petitioner about an open can of beer nearby.  *Id.*, p. 127.  Petitioner said "who, me?" twice, and then ran; Fairfield drew his gun and chased Petitioner.  *Id.*  Two other officers arrived as the chase began.  *Id.*, p. 128.  Fairfield found Petitioner standing down in a ditch in a couple of inches of water.  *Id.*, p. 129.  Petitioner scrambled back up the embankment.  *Id.*  Eventually Petitioner was surrounded by Fairfield and other officers in the woods and arrested.  *Id.*

Petitioner alleges in his § 2254 petition that the King Food Store was one and one half miles from the Winn Dixie, but that is incorrect.  It is judicially noted that the northeast corner of Meridian Street and Orange Avenue, (where the King Food Store is located) is only a block or two east of the Winn Dixie, and the Winn Dixie is at the eastern-most edge of that shopping center which fronts to the west on Monroe Street. The exact proximity of the Winn Dixie Store to the King Food Store was in evidence at trial by means of aerial photographs of that area.  *Id.*, p. 124.

Emanuel Godfrey testified that at about 4:00 p.m. that day, he visited Petitioner at Petitioner's house (which Godfrey leased to Petitioner), and Petitioner, a young woman, and a gray Acura automobile were there.  *Id.*, pp. 175-176.  Petitioner borrowed a basketball from Godfrey.  *Id.*, p. 176.  Godfrey said that they said they were heading to a southside park.  *Id.*

Godfrey said that he was employed as a program director (counselor) at the Glenn Terrell Foundation, a part of DISC village, was a subcontractor for developmental services for the Florida Department of Health and Rehabilitative Services, and worked

for the United States Postal Service.  *Id.*, pp. 177-178.  He said that he then went out in

his car to do work in several places, and on returning to the southside of Tallahassee,

he stopped at the park just off Paul Russell Road.  *Id.*, p. 179.  As he turned around, he

said he saw Petitioner, the young woman, and the car.  *Id.*  He said that it must have

been a little bit before 7:00 p.m. because he had an appointment nearby at 7:00 p.m.,

which he kept.  *Id.*, p. 182.  Godfrey said that Petitioner was about two football fields

away.  *Id.*, p. 186.  He recognized Petitioner by his clothes and the hair style of the

young woman and her clothing.  *Id.*  He said that Petitioner had on black and white

clothing.  *Id.*, p. 189.  He said that he had turned into this park to check on his

basketball and because Petitioner had asked him to stop by, but then he realized he did

not have enough time to stay.  *Id.*, p. 187.

The State tried to impeach Godfrey as to whether he could have seen Petitioner

on the basketball court from that distance by showing him a photograph taken from the

basketball court back to the spot where Godfrey said his van stopped and turned

around.  *Id.*, p. 184.  The court sustained an objection to a question of whether

someone could have seen Godfrey's van from the basketball court.  *Id.*, p. 185.

Godfrey was not impeached by any prior criminal convictions.

Lamika Ward testified that her brother asked her to pick him up from the same

basketball court that day.  *Id.*, pp. 191-192.  She left her home to do this at about 6:15

p.m.  *Id.*, p. 192.  Her home was near the Publix Oak Valley complex northeast of Lake

Jackson.  *Id.*  She drove on Capital Circle.  *Id.*, p. 193.  She estimated she arrived at the

park at about 6:40 p.m.  *Id.*  Ward said that she had met Petitioner twice before.  *Id.*

She saw Petitioner at the basketball court sitting with a woman.  *Id.*, p. 195.  On cross

examination, Ward testified that the next day, Petitioner called her, told her he had only 30 seconds to talk, told her his lawyer would be calling her, and then was cut off without explaining why the lawyer would be calling her. *Id.*, pp. 196-197. She said that the lawyer called her, told her Petitioner had been "convicted or something," and asked if she had seen him the day before. *Id.*, p. 197. She said she had, at the park. *Id.*

Petitioner testified that he played basketball with the young woman until about 7:00 p.m. *Id.*, pp. 206-207. At about 6:50 p.m., they left the court in the young woman's car. *Id.*, pp. 207-208. As they passed the King Food Store, Petitioner saw "two guys" he knew, and asked to be let out. *Id.*, p. 208. Very shortly thereafter, said Petitioner, Officer Fairfield approached him. *Id.*, p. 210. Petitioner said that he knew there was an outstanding "no bond" warrant for his arrest for a misdemeanor charge of having an "open container," so he ran. *Id.*, pp. 211-213. Petitioner said he ran into some woods and ended up looking into a ditch that "was kind of deep and it was kind of wide and it was full of muddy water;" he said that he decided not to go into the ditch and get his white shorts and white sneakers dirty over a misdemeanor warrant. *Id.*, p. 212.

The State called Investigator Moody in rebuttal. Moody had taken a series of photographs from the area in which Godrey said he had seen Petitioner on the basketball court. In Moody's opinion, it was impossible to have seen anyone on that basketball court from where Godfrey said he was because the court was at a lower elevation and trees blocked the view. *Id.*, pp. 223-225.

### Legal Analysis of Ground One

Petitioner was represented by an attorney on appeal from the denial of his Rule 3.850 motion. Appellate counsel argued that White had testified that adjudication had

been withheld as to her two prior criminal offenses, and that the state had not presented any contrary evidence.  Doc. 24, Ex. I, Appellant's Brief, p. 27.  That is true, as noted above.  This assertion of fact has not been disputed by Respondent in any court.  Petitioner contends that White could not have been impeached because adjudication was withheld as to both her prior offenses.

In 1984, the First District Court of Appeal held that a witness *could* be impeached pursuant to FLA. STAT. § 90.610 after a guilty plea to an offense even though adjudication of guilt had not yet been entered.[5]  Johnson v. State, 449 So. 2d 921, 923 (Fla. 1st DCA 1984).  However, quoting Barber v. State, 413 So. 2d 482, 484 (Fla. 2d DCA 1982), Johnson also stated in *dicta* that a witness could *not* be impeached if adjudication had been withheld by the court.  449 So. 2d at 923.

In 1997, the First District Court of Appeal held that a nolo contendere plea followed by adjudication withheld could not be used to impeach a witness, distinguishing Johnson.  On appeal to the Supreme Court, the Court avoided the issue of the definition of a "conviction" in FLA. STAT. § 90.610, relying instead on FLA. STAT. § 90.410, which provides that a nolo contendere plea is not admissible in a civil or a  criminal proceeding.

In State v. McFadden, 772 So. 2d 1209 (Fla. 2000), the Florida Supreme Court definitively held for the first time (by that court) that a plea of guilty to a charge, with adjudication withheld, could not be used to impeach the defendant when he testified.  However, the Court cited the *dicta* in Johnson and other cases to state: "The appellate

---

[5] The First District governs Leon County, where Petitioner was tried.

courts and this Court agree that if a trial court withholds adjudication there can be no prior conviction under section 90.610(1)."  772 So. 2d at 1213.

Thus, to the extent that Petitioner's attorney determined not to call White as a witness at the second trial due to her prior criminal offenses, counsel probably erred.[6]  If adjudication was withheld, the prior offenses involving dishonesty should not have been used against White to impeach her credibility.  Had counsel made this objection at trial, assuming he could have shown the adjudications were withheld, the evidence of White's criminal record would not have been in evidence.

But there other reasons given by counsel for not calling White as a witness, and those reasons show that counsel's decision was still sound trial strategy.  The Court in Strickland stated that "[j]udicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."  466 U.S. at 689, 104 S.Ct. at 2065.  The Court further noted that in judging counsel's alleged deficient performance, "every effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.*

Petitioner's attorney could have called White as a witness, but he did not think that her demeanor was credible.  Because there were two trials, counsel had the benefit

---

[6] It would have been helpful for Respondent to address this issue, but Respondent failed to address it on the appeal from denial of the Rule 3.850 motion and again in this court.

and hindsight of having elicited this witness's testimony once before, in front of a jury. Counsel thought Godfrey and Ward were good witnesses, and he did not want the cloud of a witness without credibility to impair his defense.  As counsel noted, the dispute about whether Godfrey could see Petitioner in the park from the spot where he stopped was a garden-variety factual dispute that did not call into question Godfrey's character. Ward was not impeached at all, except for the argument that she could not have left home and gotten to the park as fast as she said she did, and that argument was only a quibble about a few minutes.  Indeed, had it taken as much as 45 minutes for Ward to have made the trip, she would have arrived at the park at about 7:00 p.m., the same time that Godfrey said he saw Petitioner and the young woman.

Further, while Petitioner argues that White would have been better since she could account for his whereabouts during all relevant times, so could both Godfrey and Ward.  If their testimony had been believed and relied upon by the jury, it would have acquitted Petitioner since it was improbable that he could have been in the park at about 7:00 p.m. when he was supposed to be at the Winn Dixie parking lot at 6:40 p.m. Their testimony provided an alibi for the exact moment of the offense.

Thus, it was a sound strategic choice to rely on the more credible witnesses and not risk damage to the defense by a witness who was not believed to be credible.

Nor has Petitioner shown prejudice to the outcome.  The victims gave strong eye-witness identification testimony.  Petitioner was wearing very distinctive clothing, and he was arrested because he was wearing the clothing that the victims said their assailant was wearing.  He was only a few blocks and minutes removed from the scene of the robbery when he was arrested, and he ran when confronted by the police.  Thus,

the state court's adjudication of the merits of this federal <u>Strickland</u> claim has not

"resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United

States."  § 2254(d)(1).  Ground one is without merit.

**Ground Two**

Petitioner contends that his attorney was ineffective because he advised him that

he did not qualify for sentencing as an habitual offender, and told him he would receive

a guideline sentence.  The basis for this advice was the belief that Petitioner's prior

misdemeanor conviction in Broward County, for delivery of a counterfeit controlled

substance, did not qualify him for habitual offender status.  He asserts that the State

had made him a plea offer of a 72 month guideline sentence, and he decided not to take

this plea offer due to counsel's erroneous advice.  The trial court found this Broward

County conviction to be a third degree felony instead of a misdemeanor, and  initially

sentenced Petitioner as an habitual offender to life imprisonment.  That sentence was

changed to 20 years as an habitual offender after direct appeal and remand.

Respondent concedes exhaustion of state judicial remedies as to this claim.

Both of Petitioner's attorneys testified at the Rule 3.850 evidentiary hearing, as

did Petitioner.  Doc. 24, Ex. K, pp. 5-18, 19-54, 55-58, 22.  Parks said he and Petitioner

discussed the possibility of a life sentence when he and Petitioner discussed the "bond

situation."  *Id.*, pp. 22-23.  He did not remember telling Petitioner that the only thing he

faced was a guideline sentence of about 70 months.  *Id.*, p. 23.  Parks did not recall

looking into Petitioner's prior criminal history to see if he in fact might be sentenced as

an habitual offender, but he did let Petitioner know that the State had filed a notice of

intent to have Petitioner declared an habitual offender, and he said that he discussed

this possibility with Petitioner.  *Id.*, pp. 24-25.  Parks testified:

> As I said before, in all fairness my only recollection would be that, one,
> they put us on notice that they intend to habitualize you.  And I didn't – you
> know, in terms of going into great detail about it, I didn't do that.  But I just
> gave him a general overview, hey, you know, they are looking at doing
> something beyond a guideline sentence if you are found guilty of this.

*Id.*, p. 26.  Parks said that he thought that Petitioner went to trial understanding that he

might receive a "habitualized life sentence."  *Id.* and p. 28.  Again, however, he said he

did not try to check Petitioner's criminal history to see if he in fact qualified for habitual

offender sentencing.  *Id.*, p. 26.  He said that he and his partner, Benjamin Crump, did

not see the list of criminal offenses until the notice of intent to seek habitual offender

sentencing was filed, and they did not begin to check into Petitioner's criminal history

until Petitioner disputed one of the offenses.

On cross examination, Parks admitted that when a defendant is sentenced as an

habitual offender, the sentencing judge is free to sentence up to life in prison without

stating the reasons.  *Id.*, p. 37.  Parks admitted that the "prior record is everything" at

that point.  *Id.*

When asked whether he thought it was important, therefore, to "research his

priors," Parks said whether or not he researched the prior convictions, Petitioner knew

"the stakes are higher."  *Id.*, pp. 37-38.  Parks admitted it would be improper to tell a

client he would *not* be habitualized without looking at the prior criminal judgments.  *Id.*,

p. 38.  Parks was again asked whether he thought it important to conduct an

investigation into whether each prior conviction qualified Petitioner for habitual offender

sentencing status, and he answered that Petitioner knew he was taking his chances.

*Id.*, p. 39.  Parks admitted he did not advise Petitioner whether or not he had two

qualifying prior felonies.  *Id.*  Parks did not assert that he failed to investigate this for

lack of time.  *Id.*, p. 40.  He admitted that he had time between the first and second trials

to investigate Petitioner's criminal record.  *Id.*

Benjamin Crump also represented Plaintiff at sentencing.  *Id.*, p. 56.  Crump said

that he and Parks told Petitioner that if he was found guilty, the judge would probably

"throw the book" at him and give him a life sentence.  *Id.*, pp. 56-57 and 58.  "The

understanding was clear that this judge was hard, a very tough judge.  And if he was

found guilty, he was going to be facing a mountain."  *Id.*  He said that Petitioner still

elected to go to trial.  *Id.*, p. 57.  He said that "we told him, you are looking at life if you

take this to trial.  Judge Smith is going to be hard on you.  There was no question about

that."  *Id.*, p. 66.  He said that "we told him to take the plea."  *Id.*  Crump said that no

assurances were made to Petitioner that he would receive only a guideline sentence.

*Id.*, p. 57.

Crump said that Petitioner told him one of his convictions was not a felony, but

was a misdemeanor.  *Id.*, p. 62.  Crump made that argument at sentencing.  *Id.*  The

conviction at issue was for delivery of a counterfeit controlled substance in Broward

County, and the judgment showed it to be a third degree felony.  *Id.*, p. 63.  Crump said

he did not try to get a copy of the judgment on his own because the State had already

informed him that they were going to have the convictions at sentencing.  *Id.*, p. 65.

Crump said that when the motion for habitual offender sentencing was filed, they

alleged these convictions, but Petitioner said that "that's not the case."  *Id.*  Even at

sentencing, Petitioner said that the Broward County conviction was only a

misdemeanor, and said: "I know what happened there with the judge in Broward

County." *Id.*, p. 67.  Crump did not independently investigate whether the conviction in

Broward County was a felony.  *Id.*, p. 68.  Crump said, however, that even if he had

known that this offense was a felony, "our advice was pretty consistent the whole time

even before when we first got on the case saying you should take this plea [an offer of

about 7 years] because there is a good chance you could get found guilty."  *Id.*, p. 69.

> The trial court rejected this claim, making the following findings:
>
> Both attorneys who represented Defendant at trial testified at the
> evidentiary hearing that they never told the Defendant he would only
> receive a guideline sentence.  Both attorney[]s also testified that they
> encouraged Defendant to take the plea offer from the State because he
> was facing a first degree felony punishable by up to life imprisonment
> before a judge who was known to impose harsh sentences.  Attorney
> Daryl Parks testified that he recalled one of the main issues was the fact
> that Defendant was initially held without bond because he was charged
> with a life felony.  Mr. Parks stated the possibility of a life sentence for the
> crime charged was a topic when discussing the bond issue with the
> Defendant.
>
> The record reflects that a notice of intent to seek habitualization was filed
> August 26, 1996.  Mr. Crump testified that the Defendant was informed of
> the State's intent to seek habitualization and that he went to trial
> understanding a life sentence was a possibility.  Mr. Crump testified that
> he argued in his client's best interest that the prerequisites for
> habitualization were not met, based on the Defendant's assertion
> concerning the Broward County adjudication and relevant case law.
> Accordingly, the Court finds Defendant was not misinformed as to the
> sentencing he could receive but rather was advised by counsel of the
> seriousness of the sentencing possibilities if found guilty.

Doc. 24, Ex. G, pp. 4-5 (record references omitted).

> The trial court's findings of fact are presumed correct and that presumption may

be rebutted by Petitioner only by clear and convincing evidence.  28 U.S.C. §

2254(e)(1).  Moreover, Petitioner must show that a factual issue adjudicated by the

state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). Petitioner has not made such a showing here.

While Petitioner's counsel admitted that he did not investigate whether Petitioner's prior criminal history would qualify him for habitual offender sentencing, the trial court found as fact that counsel made it plain to Petitioner that a life sentence was possible. Counsel also recommended to Petitioner that he take the plea bargain rather than face a possible life sentence, and he refused. It might have been helpful had counsel investigated the Broward County conviction further, and made it clear to Petitioner that this was a felony, but Petitioner knew he faced a tough sentencing judge if he were found guilty.

Where a claim of ineffectiveness is based on counsel's advice which allegedly resulted in rejection of a favorable plea offer, the petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would have pleaded guilty and would [not] have insisted on going to trial." Coulter v. Herring, 60 F.3d 1499, 1504 and n. 7 (11th Cir. 1995), *cert. denied*, 516 U.S. 1122 (1996), *quoting* Hill v. Lockhart, 474 U.S. 52, 59, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985); Smith v. Singletary, 170 F.3d 1051, 1053 (11th Cir. 1999) (*quoting* Coulter).

It was Petitioner's assertion that he was not guilty at all in light of his testimony at trial and his alibi witnesses. Crump's testimony, that Petitioner refused to plead guilty and insisted upon going to trial, is therefore well supported by the record. It is doubtful that further investigation as to the Broward County offense would have changed the outcome, or would have prompted Petitioner to accept a guilty plea contrary to his claim

of innocence.[7]  Thus, the state court's adjudication of the merits of this federal claim has

not "resulted in a decision that was contrary to, or involved an unreasonable application

of, clearly established Federal law, as determined by the Supreme Court of the United

States."  § 2254(d)(1).

**Ground Three**

Petitioner contends that the prosecutor made improper closing arguments, and

that his own attorney was ineffective for failing to object and move for a mistrial.  The

trial court found that Petitioner raised the allegedly improper closing arguments on

appeal.  Doc. 24, Ex. H, pp. 3-4.  The court also denied this claim on the merits.  *Id.*

Thus, Petitioner raised this claim in his Rule 3.850 motion, and obtained the trial

court's ruling on it.  But he did not appeal the denial of this particular claim to the First

District Court of Appeal.  Doc. 24, Ex. I (Petitioner's initial brief on appeal, pp. 19-22,

summary of claims on appeal, pp. 23-46, argument).  The claim, therefore, is

procedurally defaulted.

A state prisoner bringing a defaulted constitutional claim to federal court has the

burden of demonstrating cause and prejudice for the default before obtaining relief.

Engle v. Isaac, 456 U.S. 107, 129, 102 S.Ct. 1558, 1572-1573, 71 L.Ed.2d 783 (1982),

reaffirming the holding in Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d

---

[7] Further, there is no showing that the state court would have been bound by or
would have accepted a plea bargain to 72 months.  In discussing a possible guidelines
sentence at sentencing, the court thought that a guideline sentence of nine years (108
months) would be "grossly inadequate."  Doc. 16, Ex. A (sentencing transcript), p. 20.
Since "[h]e definitely requires a sentence longer than that provided for in the sentencing
guidelines," and departure sentences were disfavored, the court thought the sentence
would be more likely upheld as a habitual offender sentence.  *Id.*, p. 21.

594 (1977); Coleman v. Thompson, 501 U.S. 722, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991).

Petitioner has not shown cause or prejudice here.  The trial court determined that the State's closing arguments were "fair comments on the evidence, reasonable inferences drawn from the evidence, or responses to arguments made by defense counsel.  Thus, they were not improper."  Doc. 24, Ex. H, p. 3.  This is true.  The closing arguments identified by Petitioner in the petition, doc. 8, pp. 5a-5i, were all proper arguments.  For example, the rhetorical question, "who is credible today and who is not?" followed by argument as to who the jury should find to be more credible, *Id.*, p. 5a, is entirely proper.  The prosecutor did not argue that he himself believed the witnesses, or that they should be believed because they were witnesses for the State.  There were a few minor objectionable portions of the closing argument, such as the statement "I can assure you [that the witnesses] would have preferred not to have been involved in this," or the argument as to the time it would have taken Ward to drive the route she said she drove, when there was no evidence as to the time it takes to drive that route.  But even had there been an objection, the outcome would have been the same.  These were relatively trivial errors, and it would have been a reasonable trial tactic to let them pass without objection.  *See* United States v. Wilson, 149 F.3d 1298, 1301, n. 5 (11th Cir. 1998) (noting "defense counsel's dilemma," as objections may draw more attention to improper comments).  Since neither cause for the default nor prejudice to the outcome has been shown, the court cannot reach the merits of this claim.

**Ground Four**

Petitioner contends in ground four that his trial attorney was ineffective for failing to move for judgment of acquittal as to the charge of aggravated assault with a firearm upon the Davis and her son.  The claim is that the State failed to prove that there was a firearm or that he put anyone in fear of their lives.

Like ground three, Petitioner raised this claim in his Rule 3.850 motion, but he did not appeal the denial of the claim.  Doc. 24, Ex. I (Petitioner's initial brief on appeal, pp. 19-22, summary of claims on appeal, pp. 23-46, argument).  The claim, therefore, is procedurally defaulted.

Petitioner has not shown cause for this procedural default, nor prejudice to the outcome.  The trial court found that there was evidence at trial that Petitioner "pointed a the gun at six year old Doug Davis and said he would be shot if Mrs. Davis did not give the Defendant her money."  Cited for this finding were pages 67-69 and 94-97 of the transcript.  This finding is supported by the transcript discussed above.  Davis said that Petitioner had a "gun on my son," threatened to put a "hole" in him, and she said she was "petrified" with fear.  This was plainly sufficient evidence to support the charges.  Neither cause for the default nor prejudice to the outcome has been shown, as the claim is unsupported.  The court cannot reach the merits of this defaulted claim.

**Ground Five**

In ground five, Petitioner contends that fundamental error occurred because the evidence was insufficient to support a conviction for robbery with a weapon because there was no evidence that the "object allegedly carried met the legal definition of a weapon."  The trial court found this claim to be procedurally defaulted because

Petitioner should have raised it on direct appeal.  Doc. 24, Ex. H, p. 2.  Further, the claim was not raised again on direct appeal from denial of the Rule 3.850 motion.

Petitioner cannot show prejudice to the outcome.  Davis testified that she saw a gun.  Doc. 16, Ex. A, transcript, p. 68.  She said she "took note of the gun."  *Id.*, p. 69. She described it as silver in color, small, filling the palm of Petitioner's hand, with a "snout."  *Id.*, p. 69.  "[H]e had it laid out in his hand so that I would actually see it."  *Id.* This is sufficient evidence that Petitioner used a firearm.  Since Petitioner cannot show either cause for his default or prejudice to the outcome, the court cannot reach the merits of this claim.

It is therefore **RECOMMENDED** that the court **DENY WITH PREJUDICE** the petition for writ of habeas corpus filed by Mark F. Bedford pursuant to 28 U.S.C. § 2254, challenging his conviction in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, case number 96-1373, for armed robbery with a weapon, aggravated assault with a deadly weapon, and resisting an officer with violence.

**IN CHAMBERS** at Tallahassee, Florida, on June 17, 2005.


**s/    William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**